## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DARRON FAIR,                          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )        Case No. 20-CV-0470-GKF-CDL
                                      )
SCOTT CROW, et al.,                   )
                                      )
          Defendants.                 )

## OPINION AND ORDER

Darron Fair, a state inmate appearing *pro se*, brings this action, under 42 U.S.C. § 1983, to vindicate alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process.  He claims these violations occurred in 2019 while he was incarcerated at the Northeast Oklahoma Correctional Center (NEOCC) in Vinita, Oklahoma.  In his amended complaint [Dkt. 15], Fair identifies five claims against nine defendants, all of whom are officials with or employees of the NEOCC or the Oklahoma Department of Corrections (ODOC).  Fair purports to sue each defendant in his or her individual and official capacities, and seeks declaratory relief, compensatory damages and punitive damages.

Defendants Scott Crow, Casey Hamilton, FNU Blackward, Albert Everett, Crystal Wise, FNU Jordan, FNU Gole, and FNU Greene (collectively, Movants) seek dismissal of the amended complaint, under Fed. R. Civ. P. 12(b)(6).  In their motion to dismiss (Dkt. 37), Movants assert, in part, that Fair failed to exhaust available administrative remedies before commencing this civil action, as required by 42 U.S.C. § 1997e(a).[1]  Fair did not file a response to the motion.

---

[1] There is no indication that Defendant Kim Palmer joined this motion.  [Dkt. 37, at 1.]

Because Movants' exhaustion argument requires this Court to consider materials outside of the pleadings, the Court will treat the motion to dismiss as a motion for summary judgment, under Fed. R. Civ. P. 56.  *See* Fed. R. Civ. P. 12(d) (providing that Rule 12(b)(6) motion must be treated as motion for summary judgment when "matters outside the pleadings are presented to and not excluded by the court").[2]  On the record presented,[3] the Court finds no genuine issue for trial as to Movants' affirmative defense that Fair failed to exhaust available administrative remedies. The Court thus grants the motion, enters summary judgment in favor of all defendants as to the affirmative defense that 42 U.S.C. § 1997e(a)'s exhaustion requirement bars relief, and dismisses

---

[2] In a prior order [Dkt. 33], the Court directed the ODOC to investigate the allegations in the amended complaint and file a special report.  *See Martinez v. Aaron*, 570 F.2d 317, 318-19 (10th Cir. 1978) (permitting consideration of investigative reports compiled by prison officials). In that same order, the Court gave all parties notice that the Court may consider the special report in deciding whether to grant summary judgment, either on motion of a party or on its own motion, and advised all parties to file with their motions or responses any materials pertinent to a summary judgment proceeding.  *See* Fed. R. Civ. P. 12(d) (requiring courts to provide parties "reasonable opportunity to present all the material that is pertinent to the motion"); *Gee v. Pacheco*, 627 F.3d 1178, 1186-87 (10th Cir. 2010) (discussing notice required when district court converts Rule 12(b)(6) motion to summary judgment motion); *see also* Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may:  (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.").

[3] For purposes of summary judgment, the Court will treat Fair's verified amended complaint [Dkt. 15] and the special report [Dkt. 36] as affidavits, to the extent the statements therein meet the requirements set forth in Fed. R. Civ. P. 56(c)(4).  *See Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992) ("On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence."); *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) (discussing treatment of verified complaint as affidavit); *see* Fed. R. Civ. P. 56(c)(4) (providing that an affidavit must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated therein").  In addition, because Fair appears without counsel, the Court liberally construes the amended complaint.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

the amended complaint as to all claims raised therein.[4]

## I.      Fair's claims and allegations

Fair was incarcerated at the NEOCC from August 2016 to November 2019.  [Dkt. 36, at 4.][5]  Fair alleges that on September 13, 2019, and again on September 14, 2019, he "was assaulted, beaten, and robbed" by several inmates who were not assigned to Fair's unit, resulting in "significant injuries" and the loss of several items of personal property.  [Dkt. 15, at 4, 8-9.]  The ODOC's internal investigation of these incidents indicate that the September 13, 2019 incident involved four inmates approaching Fair in his prison cell to resolve a dispute over a $1 debt owed by Fair.  [Dkt. 36-2, at 14-15.]  Fair told the ODOC's investigator that one inmate brandished a knife and demanded Fair's cell phone, Fair agreed to a "fair fight" to determine possession of the cell phone, Fair lost the fight, and Fair "turned over his cell phone" to the inmate who won the fight.  [Dkt. 36-2, at 15-16.]

The next day, September 14, 2019, an inmate housed in a nearby cell warned Fair that several inmates were "preparing to come to [Fair's] cell and rob him of his property."  [Dkt. 36-2, at 16.]  Fair permitted an inmate to take possession of Fair's television and radio "for safe keeping." [Dkt. 36-2, at 16-18.]  According to Fair, later that same day several inmates physically assaulted him and "robbed [him] of a number of items [that he values at] approximately $1,598.00."  [Dkt. 15, at 9.]   After this five-minute attack, Fair approached Sergeant Robyn Jordan, the unit supervisor, told Jordan that several inmates had stolen his property, and asked Jordan to place him

---

[4] As previously noted, *see supra* n.1, Palmer did not join the motion to dismiss.  However, as further discussed below, the failure to exhaust administrative remedies bars each of Fair's claims, including claim three, the only claim he asserts against Palmer.  The Court thus finds it appropriate to grant summary judgment to Palmer, a nonmovant, under Fed. R. Civ. P. 56(f)(1).

[5] For consistency, the Court's citations refer to the CM/ECF header pagination.

in protective custody.[6]  [Dkt. 15, at 9; Dkt. 36-2, at 17, 26.]  Jordan escorted Fair to Central Control, where Lieutenant Gole "took photos of [Fair's] injuries."  [Dkt. 15, at 9; Dkt. 36-2, at 17, 27.]

At some point thereafter, Fair was placed in the segregated housing unit (SHU) "where [he] learned that he was still listed on the 'Gang Database Sheet as a "Crip."'"  [Dkt. 15, at 9; Dkt. 36-9, at 3.][7]  While Fair was in the SHU, his "property and personals was packed and placed in bulk inmate personal property."  [Dkt. 15, Am. Compl., at 9.]  On November 6, 2019, Fair was transferred from the NEOCC to the Joseph Harp Correctional Center (JHCC), in Lexington, Oklahoma.  [Dkt. 15, Am. Compl., at 9; Dkt. 36-1, at 4.]  According to Fair, several items of his personal property were not transferred to him when he was transferred to the JHCC.  [Dkt. 15, Am. Compl., at 5-6, 9-10.]

Based on the foregoing events, Fair commenced this civil rights action in July 2020.  In the amended complaint filed October 7, 2021, he identifies five claims.

First, Fair claims Scott Crow, the ODOC's Director, and Casey Hamilton, the NEOCC's warden, violated the Eighth Amendment's prohibition against cruel and unusual punishment by acting with deliberate indifference to the substantial risk for inmate-on-inmate violence.  [Dkt. 15, at 5.]  He alleges Crow and Hamilton failed to implement adequate policies for identifying and classifying members of gangs and other STGs which "resulted in [Fair] being misidentified and

---

[6] Based on this Court's reading of the amended complaint and the ODOC's internal investigation, the Court finds that the defendant Fair identifies as FNU Jordan is Sgt. Robyn Jordan.  The Clerk of Court shall correct the record to reflect Defendant FNU Jordan's full name as Robyn Jordan.

[7] The NEOCC's STG database identifies Fair as a suspected Crip member.  [Dkt. 36-9, at 3.]  According to ODOC policy (OP-040119), a Security Threat Group (STG) is "[a]ny group, organization, or association of three or more individuals who possess common characteristics which serve to distinguish them from other individuals or groups, and who have been determined to be acting together, and posing a threat or potential threat to the safety or security of staff, other inmates, ODOC institutions, or outside communities."  [Dkt. 36-8, at 2.]

misclassified as a 'Crip' gang member and caus[ed] [him] to be targeted by gang members for violence and eventually attacked." [Dkt. 15, at 5.]

Second, Fair claims Sergeant Greene, the NEOCC's STG officer, violated the Eighth Amendment's prohibition against cruel and unusual punishment by acting with deliberate indifference to the substantial risk of inmate-on-inmate violence when Greene "misidentified and misclassified [Fair] as a member of the 'Crip Gang." [Dkt. 15, at 5-6.] Fair alleges Greene "had actual knowledge that [Fair] was not a gang member of any kind," and that Greene's action of entering the incorrect information into Fair's ODOC files "caus[ed] [Fair] to be targeted by gang members for violence and eventually attacked, beaten[] and robbed." [Dkt. 15, at 6.]

Third, Fair claims Kim Palmer, his case manager, and Sergeant Robyn Jordan, the unit shift supervisor, violated the Eighth Amendment's prohibition against cruel and unusual punishment by acting with deliberate indifference to the substantial risk of inmate-on-inmate violence. He alleges Palmer and Jordan both "had actual knowledge that [Fair] was not a gang member" but failed to grant his requests to correct his ODOC files to reflect that he is not a gang member. [Dkt. 15, at 6-7.] He further alleges Palmer's and Jordan's failure to correct the information in his files "result[ed] in [Fair] being targeted for violence and attacks and [being] beaten[] and robbed." [Dkt. 15, at 7.]

Fourth, Fair claims Crow, Hamilton, Crystal Wise, the NEOCC's warden designee, and Lieutenant Gole, the shift supervisor, violated the Eight Amendment's prohibition against cruel and unusual punishment by acting with deliberate indifference to the substantial risk of inmate-on-inmate violence. [Dkt. 15, at 7-8.] He alleges all four defendants "failed to segregate active and violent gang members and members of [STGs] from general population inmates, failed to prevent violent gang members and members of [STGs] from trespassing in and on units which

they are not assigned to," and "failed adequately to staff [the NEOCC]  where more than one Correctional Officer can be assigned on duty to supervise and control the 200 or more inmates in a unit."  [Dkt. 15, at 7-8.]  He further alleges that these particular failures resulted in Fair being "assaulted, beaten, and robbed by gang members who were not assigned to [Fair's] assigned unit and who had illegally trespassed with no interference by staff," on September 13 and 14, 2019, leaving Fair with "significant injuries" and resulting in the loss "of a significant amount of his property."  [Dkt. 15, at 8.]

Fifth, Fair claims Jordan, Gole, Crow, Albert Everett, the NEOCC's property officer, and CTU Officer Blackward violated the Eighth Amendment's prohibition against cruel and unusual punishment by acting with deliberate indifference to the substantial risk of inmate-on-inmate violence and violated the Fourteenth Amendment by depriving him of his personal property without due process.  [Dkt. 15, at 8-9.]  As factual support for claim five, Fair alleges:

> On September 13, 2019, and on September 14, 2019, [Fair] was assaulted and attacked by a number of gang members.  They were armed with shanks and beat [Fair], tried to stab him continually and robbed [him] of a number of items totaling approximately $1,598.00.  The attack lasted about 5 minutes until [he] was able to escape and get to the Unit Supervisor Sgt. Jordan.  [Fair] was then placed in handcuffs and finally escorted to central where Defendant Lt. Gole took photos of [Fair's] injuries.  [Fair] was then placed in SHU pending investigation and [that is] where [Fair] learned that he was still listed on the "Gang Database Sheet as a 'Crip.'"  On November 5, 2019, [Fair] was transferred from [the NEOCC], still listed as a "Crip" in his [DOC] files.  While in SHU, [Fair's] property and personals was packed and placed in bulk inmate personal property.

[Dkt. 15, at 9.][8]  Based on these facts, Fair alleges Crow and Hamilton "failed to implement adequate policies and practices fo[r] retrieving property stolen or robbed from inmates by inmates [and] failed to implement adequate packing, inventorying, storage and securing bulk inmate

---

[8] Fair's supporting facts also identify 11 specific items, or groups of items, of personal property that he was allegedly deprived of without due process.  [Dkt. 15, at 9-10.]

personal property." [Dkt. 15, at 9.] He further alleges Everett and Blackward "failed to retrieve, pack, inventory, store and secure [Fair's] property and transfer [his] property to him once transferred." [Dkt. 15, at 9.]

## II.   Analysis

Movants seek summary judgment, in part, as to their affirmative defense that Fair failed to exhaust available administrative remedies before filing this civil action, as required by 42 U.S.C. § 1997e(a), a provision of the Prison Litigation Reform Act (PLRA). [Dkt. 37, at 11-20.]

### A.   Summary judgment standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine' when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At the summary-judgment stage, the court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249). And, "[i]n making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

**B.    The PLRA's exhaustion requirement**

Section 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  This exhaustion requirement applies if the plaintiff is a prisoner at the time of the filing of the lawsuit, regardless of whether he or she is released from custody while the litigation is pending.  *May v. Segovia*, 929 F.3d 1223, 1228 (10th Cir. 2019).[9]  Also, this exhaustion requirement is "mandatory," *Jones v. Bock*, 549 U.S. 199, 211 (2007), and it "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *see also Ross v. Blake*, 578 U.S. 632, 639 (2016) (stating that § 1997e(a)'s "mandatory language means a court may not excuse a failure to exhaust, even to take [special] circumstances into account").

But "the PLRA contains its own, textual exception to mandatory exhaustion" because it only requires exhaustion of "available" administrative remedies.  *Blake*, 578 U.S. at 642.  Thus, a prisoner "need not exhaust unavailable ones."  *Id.*  In *Blake*, the United States Supreme Court

---

[9] There is no question in this case that the PLRA applies.  Fair has been in DOC custody since December 2012.  [Dkt. 36-1, at 2.]  He was incarcerated at the NEOCC from August 18, 2016, until November 6, 2019, when he was transferred to the JHCC.  [Dkt. 36-1, at 2, 4.]  Fair commenced this action on July 28, 2020, while housed at the JHCC, and he was transferred to the William S. Key Correctional Center (WKCC) on September 1, 2020, just over month before he filed the amended complaint on October 7, 2020.  [Dkt. 1, Compl., at 1; Dkt. 15, Am. Compl., at 1; Dkt. 36-1, at 4.]  Fair is now incarcerated at the Joseph Dunn Correctional Center (JDCC).  [Dkt. 40, at 1.]  Because the undisputed facts show that Fair was a "prisoner" within the meaning of the PLRA when he filed his original and amended complaints and, further, that this lawsuit is clearly about "prison life," there is no genuine dispute as to whether the PLRA's exhaustion requirement applies.  *May*, 929 F.3d at 1227-28; *Nussle*, 534 U.S. at 524, 532.

explained that administrative remedies are "unavailable" if an administrative procedure (1) "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," (2) "exists to provide relief, but no ordinary prisoner can discern or navigate it," or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Blake*, 578 U.S. at 643-44; *see also Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) (stating that "[w]here prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust"). "Although a defendant bears the burden of 'proving that the plaintiff did not [exhaust his] administrative remedies,' once the defendant has carried that burden, 'the onus falls on the plaintiff to show that remedies were unavailable to him.'" *May*, 929 F.3d at 1234.

When administrative remedies are available, the PLRA "requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Exhaustion is determined on a claim-by-claim basis, *May*, 929 F.3d at 1227-28, and "[a]n inmate properly exhausts a claim by utilizing each step the prison holds out for resolving the claim internally and by abiding 'with an agency's deadlines and other critical procedural rules,'" *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) (unpublished)[10] (quoting *Ngo*, 548 U.S. at 90). Because "substantial compliance is insufficient" to satisfy the PLRA's exhaustion requirement, "'[a]n inmate who begins the grievance process but does not complete it is barred from pursuing a [federal] claim under the PLRA for failure to exhaust administrative remedies.'" *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007) (quoting *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002)).

---

[10] The Court cites this unpublished decision as persuasive authority. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

C.      **The ODOC grievance process**

The ODOC has a written policy (OP-090124) governing the "Inmate/Offender Grievance Process." [Dkt. 36-10, at 2-28.] That process requires an inmate who has a complaint about a grievable issue to first attempt informal resolution. The inmate must try to resolve his or her issue by talking to staff within three days of the incident that gave rise to the issue. [Dkt. 36-10, at 7.] If talking does not resolve the issue, the inmate may submit a written Request to Staff (RTS) within seven days of the incident. [Dkt. 36-10, at 7.]

If this informal resolution process fails, either because the inmate does not receive a response to the RTS or because the response does not resolve the inmate's issue, the inmate may initiate the formal grievance process by filing a written grievance with the proper reviewing authority. [Dkt. 36-10, at 9.] As relevant here, the reviewing authority is the head of the facility where the incident occurred. [Dkt. 36-10, at 2.] Regarding a failure to respond to the inmate's RTS, the ODOC policy provides: "If there has been no response in 30 days, but no later than 60 days, of submission [of the RTS], the inmate may file a grievance to the reviewing authority with a copy of the [RTS] attached to the grievance form. The grievance may assert only the issue of the lack of response to the [RTS]." [Dkt. 36-10, at 9.] In the case of a response to an RTS that does not resolve the inmate's issue, the inmate must file a grievance, with the RTS and response attached, no later than "15 days from the date of the receipt of the response to the [RTS]." [Dkt. 36-10, at 9-10.] "If the inmate/offender does not follow instructions as explained in [OP-090124] and on the grievance forms, the grievance may not be answered." [Dkt. 36-10, at 10.]

If the reviewing authority fails to respond to a grievance, the inmate may submit a grievance to the Administrative Reviewing Authority (ARA), within 30 days, but no later than 60 days," from the time the inmate submitted the grievance to the reviewing authority. [Dkt. 36-10,

at 11.]   In this situation, "[t]he grievance submitted to the ARA will assert only that the inmate's/offender's grievance was not answered by the reviewing authority."  [Dkt. 36-10, at 11.]

If the inmate receives a grievance decision from the reviewing authority, the inmate may appeal that decision, on limited grounds,[11] by filing an appeal with the ARA "within 15 days of the inmate/offender's receipt of the reviewing authority's decision or any amended decisions." [Dkt. 36-10, at 13-16.]  "If the ARA determines that the grievance needs further investigation or review by the reviewing authority, the grievance may be returned to the reviewing authority for further investigation and for an amended response to the inmate/offender."  [Dkt. 36-10, at 15.] "The ruling of the ARA is final and will conclude the internal administrative process."  [Dkt. 36-10, at 16.]

### D.      Fair's attempts at exhaustion

In his amended complaint, Fair does not allege any facts suggesting the ODOC's grievance process was not available to him.  Rather, Fair generally alleges he "used the Prisoner Grievence [sic] procedure available at [the NEOCC] and [JHCC] to try to solve the problems."  [Dkt. 15, at 10.]  He specifically alleges that he "presented the facts relating to this complaint" on September 30, 2019, and November 14, 2019, that on both occasions he "was sent denial responses saying that the grievances had been denied," and that he appealed the denial of the grievances on November 20, 2019, and November 27, 2019.  [Dkt. 15, at 10.]  With the amended complaint, Fair submitted documents demonstrating he filed two formal grievances, Grievance 19-23A and Grievance 20-22.  [Dkt. 15, at 12-29.]

Movants do not dispute that Fair filed two formal grievances.  Rather, Movants contend,

---

[11] The inmate may assert that he or she has newly discovered or newly available evidence that was not considered by the reviewing authority or that the reviewing authority committed probable error that supports reversal.  [Dkt. 36-10, at 13.]

based on materials submitted with the special report, that the uncontroverted evidence shows Fair failed to failed to properly exhaust the grievance process as to any of his claims.  [Dkt. 37, at 11-20.]

### 1.      Grievance 19-23A

Fair submitted Grievance 19-23A to Casey Hamilton, the NEOCC's warden, on November 14, 2019.  [Dkt. 15, at 20; Dkt. 36-17, at 3.]  In this grievance, Fair complained that the "negligence of N.E.O.C.C. security" caused inmates from other units or buildings to attack him and steal his property on September 13 and September 14, 2019.  [Dkt. 15, at 20.]  On the grievance form, Fair stated that he attempted to resolve this issue by submitting RTSs on September 30, 2019, October 10, 2019, October 24, 2019, and October 30, 2019.  [Dkt. 15, at 20.]  The relief he requested was that his "property be replaced or [that he] be reimbursed for [his] property."  [Dkt. 15, at 20.]

Hamilton issued a grievance decision on November 20, 2019, and Fair received it on November 25, 2019.  [Dkt. 15, at 21; Dkt. 36-17, at 2.]  That decision stated:

> When you transferred on 11/05/2019, you were sent all of the property noted on your property inventory sheet, to include 1 box and 1 duffle bag with the items listed on your property inventory sheet.  CTU Officer Blackward signed for the items on 11/6/2019.  You received all property which was inventoried by Property Officer Albert Everett.  Per OP-030120, designated area for the storage of bulk inmate personal property was stored and once you transferred all property was sent, relief denied.

[Dkt. 15, at 21.]

Fair filed an appeal with the ARA on November 27, 2019.  [Dkt. 36-18, at 2.]  Fair asserted that the reviewing authority committed probable error and alleged that the reviewing authority misunderstood the basis of his complaint.  [Dkt. 36-18, at 2.]  Specifically, he explained that he was not complaining that he did not receive all of his property when he was transferred to the JHCC; rather, his complaint was "that the Security allowed inmates from another unit to come jump on [him] with knifes [sic] and take [his] property."  [Dkt. 36-18, at 2.]  The ARA received

the appeal on December 4, 2019.  [Dkt. 36-18, at 2.]  On December 19, 2019, the ARA sent Fair a letter advising him that his grievance had been forwarded to the NEOCC's warden "for further review and investigation" and that he would receive an amended response.  [Dkt. 15, at 14; Dkt. 36-18, at 6.]  In an amended response, dated December 20, 2019, the NEOCC's warden designee, Crystal Wise, indicated Fair's original grievance correspondence was being returned unanswered because (1) a RTS was not included with the grievance, (2) the grievance was untimely, and (3) the grievance was "impossible to investigate as [Fair] failed to list any stolen items and [he] abused the process by submitting multiple RTS[s] to different staff members."  [Dkt. 15, at 15; Dkt. 36-18, at 3.]

Following his receipt of the amended response, Fair filed an appeal with the ARA alleging the reviewing authority committed probable error because Fair filed multiple RTSs only after being told by the official who responded to the first RTS to "follow chain of command" and because he could not timely submit RTSs due to a facility lockdown and his placement in the SHU.  [Dkt. 36-19, at 2.]  On January 8, 2020, the ARA affirmed the reviewing authority's decision that Grievance 19-23A was filed improperly because it was untimely, involved the submission of multiple RTSs, and failed to list any items of stolen property.  [Dkt. 15, at 13; Dkt. 36-19, at 3.]

The ARA's final ruling as to Grievance 19-23A thus held that Fair failed to properly present the substance of his grievable issue regarding alleged security lapses at the NEOCC that led to Fair being attacked and robbed by other inmates.  Liberally construing the amended complaint, this issue forms the basis for the allegations he asserts against Crow, Hamilton, Wise and Gole in claim four and the allegations he asserts against Crow, Hamilton, Everett and Blackward in claim five.  Because the uncontroverted evidence shows that Fair failed to comply with the ODOC's policies for submitting Grievance 19-23A, these defendants are entitled to

summary judgment as to the affirmative defense that Fair failed to properly exhaust available administrative remedies as to claims four and five.

### 2.    Grievance 20-22

Fair submitted Grievance 20-22 to Luke Pettigrew, the JHCC's warden, on February 25, 2020. [Dkt. 15, at 27; Dkt. 36-12, at 7.] In this grievance, Fair complained that he had not received a response regarding a RTS he resubmitted on January 22, 2020, and he asked Pettigrew to direct that he receive a response. [Dkt. 15, at 27.] In the underlying RTS, dated January 22, 2020, (which was also submitted to Pettigrew), Fair alleged that in 2018 his case manager advised him that he was listed in the NEOCC's database as a "Crip." [Dkt. 15, at 25; Dkt. 36-12, at 8.] He further alleged that he told the unit treatment team that he was not a gang member. [Dkt. 15, at 25.] The relief he requested in the underlying RTS was that he "be removed from the [NEOCC's] Gang Database" and no longer referred to as a gang member. [Dkt. 15, at 25.][12] Pettigrew issued a grievance decision on March 2, 2020, granting Fair's request for a response to his RTS and stating that an amended response was attached. [Dkt. 15, at 26; Dkt. 36-12, at 6.] According to Fair, the amended response consisted of two copies of the January 22, 2020 RTS. On one copy, the response (signed March 2, 2020) advised Fair to re-submit his complaint regarding the NEOCC gang database to the STG officer. [Dkt. 15, at 25; Dkt. 36-12, at 8.] On the other copy, the response (signed March 3, 2020) indicated that the RTS had been forwarded to Sgt. Rodgers, the STG officer at the JHCC who, in turn, responded: "I will look into the situation. I have no control over another facility or their STG database though." [Dkt. 15, at 23.]

Fair received the grievance decision, with the amended response, from Pettigrew on March

---

[12] Fair previously submitted RTSs regarding this same issue on October 23, 2019, and January 13, 2020. [Dkt. 15, Am. Compl., at 22, 28; Dkt. 36-11, at 130, 132.]

10, 2020, and filed an appeal with the ARA on March 19, 2020.  [Dkt. 36-12, at 4.]  In the appeal, Fair acknowledged receipt of the amended response, in response to the non-response grievance he filed in Grievance 20-22, but he alleged that the reviewing authority committed probable error in its decision.  [Dkt. 36-12, at 4.]  Though not clear, Fair appeared to identify the probable error as the reviewing authority's failure to grant relief on the merits of his underlying request to be removed from the NEOCC's gang database.  [Dkt. 36-12, at 4-5.]  On April 20, 2020, the ARA determined that Fair failed to show error and affirmed the reviewing authority's decision in Grievance 20-22, granting Fair's request for a response.  [Dkt. 15, at 12; Dkt. 36-12, at 3.]  The ARA's final ruling was the last step in exhausting available administrative remedies regarding his non-response grievance.  [Dkt. 36-13, at 2.]

As Movants contend, the undisputed facts show that Fair exhausted available administrative remedies only as to the non-response grievance he filed in Grievance 20-22 complaining about the lack of a response to his January 22, 2020 RTS.  *See* Dkt. 36-10, at 8 (providing that inmate may file a grievance "assert[ing] only the issue of the lack of response to the 'Request to Staff'").  But after Fair received a grievance decision granting the relief he requested in his non-response grievance—i.e., that he receive a response to his January 22, 2020 RTS—Fair did not submit a separate grievance or a grievance appeal regarding the substance of the amended response he received to that RTS which effectively advised him that the STG officer at the JHCC would "look into" his complaint that officials at the NEOCC misclassified him as a gang member in the NEOCC's gang database.  Thus, on the record presented, no reasonable jury could find that Fair properly presented the substance of his grievable issue regarding the alleged misclassification of Fair as a gang member.  Liberally construing the amended complaint, this issue forms the basis for the allegations he asserts against Crow and Hamilton in claim one, the

15

allegations he asserts against Greene in claim two, and the allegations he asserts against Palmer and Jordan in claim three.  Because the uncontroverted evidence shows that Fair failed to comply with ODOC's grievance process as to the issue of his alleged misclassification as a gang member, these defendants are entitled to summary judgment as to the affirmative defense that Fair failed to properly exhaust available administrative remedies as to claims one, two and three.

### E.    Conclusion

Based on the foregoing, no reasonable juror could find that Fair properly exhausted available administrative remedies as to any of the five claims he identifies in the amended complaint before filing this action, as required by 42 U.S.C. § 1997e(a).  *See Fields*, 511 F.3d at 1112 (10th Cir. 2007).  The Court therefore grants summary judgment in favor of all defendants as to the affirmative defense of non-exhaustion and dismisses the amended complaint as to all claims raised therein.[13]

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall correct the record to reflect Defendant FNU Jordan's full name as Robyn Jordan.

2. The Movants' motion to dismiss [Dkt. 37], is treated as a motion for summary judgment and is **granted**, under Fed. R. Civ. P. 56(a) as to the affirmative defense that Fair failed to properly exhaust available administrative remedies.

3. Summary judgment is **granted** in favor of nonmovant Kim Palmer, under Fed. R. Civ. P. 56(a) and (f)(1), as to the affirmative defense that Fair failed to properly exhaust available administrative remedies.

---

[13] Based on this conclusion, the Court declines to address any remaining arguments in the motion to dismiss.

16

4.  The amended complaint (Dkt. 15) is **dismissed**.

5.  This is a final action terminating this case.

**DATED** this 27th day of October 2021.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE